IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


CARPET SUPER MART, INC.,        )
ARTHUR C. JORDAN, JR., and      )
JOYCE J. MOBLEY,                )
                                )
          Plaintiffs,           )
                                )
     v.                         )          1:18CV398
                                )
BENCHMARK INTERNATIONAL COMPANY )
SALES SPECIALIST, LLC, DARA     )
SHAREEF, and BRIAN LOCKLEY,     )
                                )
          Defendants.           )


## <u>MEMORANDUM OPINION AND ORDER</u>

**OSTEEN, JR., District Judge**

       Presently before this court is Defendants' Motion to
Dismiss Complaint or in the Alternative, Motion for Summary
Judgment. (Doc. 6.) Defendants have also moved for sanctions.
(<u>See</u> Doc. 13.) Defendants ask this court to dismiss Plaintiffs'
request for a declaratory judgment and Plaintiffs' claims for
fraud and misrepresentation and unfair and deceptive trade
practices for failure to state a claim pursuant to Fed. R. Civ.
P. 12(b)(6). Defendants further ask this court to impose
sanctions on Plaintiffs' counsel for allegedly filing a
complaint that lacks factual support, has no chance of success
under existing precedent, and was brought for an improper
purpose. For the reasons that follow, this court finds that

Defendants' motion to dismiss should be granted in full and that Defendants' motion for sanctions should be denied.

## I.   FACTUAL & PROCEDURAL BACKGROUND

Plaintiff Carpet Super Mart, Inc. ("Carpet") is a North Carolina corporation that "was engaged in the business of commercial and residential sales and installation of carpet and flooring products." (First Amended Complaint ("First Am. Compl.") (Doc. 21) ¶ 17.) Plaintiffs Arthur C. Jordan, Jr. ("Jordan") and Joyce J. Mobley ("Mobley") were the owners of Carpet. (Id. ¶ 18.) Plaintiffs entered into a listing agreement with Defendant Benchmark International Company Sales Specialist, LLC ("Benchmark") on May 27, 2014, pursuant to which Benchmark agreed to provide certain services to facilitate the potential sale of Carpet's business. (Id. ¶¶ 19, 25; Doc. 21-1.) Defendants Dara Shareef and Brian Lockley are each employed by Benchmark. (Id. ¶¶ 9-10.)

The listing agreement (titled "Terms of Engagement") states that "upon the closing of a Transaction, Client will pay Benchmark a Transaction Fee equal to 5% of the Transaction Value subject to a minimum Transaction Fee of $100,000." (Doc. 21-1). The listing agreement does not define any capitalized terms, but states that "[t]his agreement is made subject to Benchmark's Standard Terms and Conditions which are incorporated herein by reference." (Id. (emphasis added).) The Standard Terms and

-2-

Conditions contain a lengthy definition of "Transaction Value" that provides, in part, that the "magnitude shall be based on the total benefit received by Client and any related parties pursuant to the Transaction regardless of the form of . . . consideration" and lists several examples of non-cash benefits that may be used for this calculation. (Doc. 21-2.)

Plaintiffs allege that they did not receive the Standard Terms and Conditions before signing the listing agreement but did receive this document at some later time. (See First Am. Compl. (Doc. 21) ¶¶ 24-25, 39-40.) Prior to and following the signing of the listing agreement, and up until the final agreement to sell Carpet's business, Jordan and Mobley repeatedly sought to clarify how the commission fee would be calculated. (Id. ¶¶ 21, 27, 50.) Each time, Jordan and Mobley were told by Benchmark employees that the fee was five percent of the sale price. (Id.)

Benchmark obtained a potential buyer for Carpet in the fall of 2017 and the parties entered into a final agreement for the sale of Carpet's business. (Id. ¶¶ 48-54.) After the final sale agreement was signed, Benchmark sought a commission equal to five percent of the total value of the buyer's lease with

Carpet's former landlord, which presumably produced an amount greater than five percent of the sale price.[1] (See id. ¶¶ 58-59.)

Plaintiffs filed their initial Complaint in Guilford County Superior Court and Defendants subsequently removed the case to this court. (See Doc. 1-2.) Defendants moved to dismiss the Complaint and submitted a memorandum in support of their motion. (See Doc. 8.) Plaintiffs responded, (Pls.' Resp. to Defs.' Mot. to Dismiss ("Pls.' Resp. Br.") (Doc. 16)), and Defendants replied, (Doc. 17.) Defendants then moved for Rule 11 sanctions and filed a memorandum, (Defs.' Mem. in Supp. of Rule 11(c)(2) Mot. for Sanctions ("Defs.' Sanctions Mem.") (Doc. 14)), to which Plaintiffs responded, (Doc. 18), and Defendants replied, (Doc. 19.)

This court previously entered an order, (Doc. 20), granting Plaintiffs' motion to amend their Complaint, (Doc. 15), to withdraw their Civil RICO claim. Therefore, the First Amended Complaint, (Doc. 21), is now the operative pleading and this court will refer to that document as the Complaint. Plaintiffs

---

[1] The Complaint requests a declaratory judgment that the commission is five percent of the sale price, exclusive of the value of any lease. This court concludes that the contract does permit the imposition of a commission greater than five percent of the sale price. Because there is no allegation of any dispute about how to properly calculate the value of the lease assumption (assuming, as found, that Defendants are entitled to that value as a matter of contract), this court will not address the question of value herein.

bring the following claims: (1) a request for declaratory judgment that the contractual commission is five percent of the sale price (or $188,600.00), (2) fraud and misrepresentation, and (3) unfair and deceptive trade practices. (First Am. Compl. (Doc. 21) ¶¶ 63-68, 69-89, 90-93.)

## II. STANDARD OF REVIEW

### A. Standard on Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In other words, the plaintiff must plead facts that "allow[] the court to draw the reasonable inference that the defendant is liable" and must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678.

When ruling on a motion to dismiss, this court must accept the complaint's factual allegations as true. Iqbal, 556 U.S. at 678. Further, "the complaint, including all reasonable inferences therefrom, [is] liberally construed in the plaintiff's favor." Estate of Williams-Moore v. All. One Receivables Mgmt., Inc., 335 F. Supp. 2d 636, 646 (M.D.N.C. 2004) (citation omitted). Despite this deferential standard, a court will not accept legal conclusions as true, and

"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, [will] not suffice." Iqbal, 556 U.S. at 678.

**B. Jurisdiction and Applicable Law**

This court has jurisdiction over this case pursuant to 28 U.S.C. § 1332. The parties are diverse. (See id. ¶¶ 1-4, 11, 13.) In a declaratory judgment action, "the amount in controversy is measured by the value of the object of the litigation." Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 347 (1977). Here, the object of the litigation is the commission fee that Benchmark is owed for procuring a buyer. Plaintiffs concede the value of this fee is at least $188,600.00, (see First Am. Compl. (Doc. 21) ¶ 68), while Defendants assert they are owed a higher amount. Therefore, the amount in controversy here is at least $188,600.00 and this court may exercise diversity jurisdiction. See Dixon v. Edwards, 290 F.3d 699, 710-11 (4th Cir. 2002) (finding that the amount in controversy for a declaratory judgment action seeking to invalidate a contract was equal to the value of services rendered under the contract).

A federal court sitting in diversity jurisdiction applies the relevant substantive law of the state in which the court sits, while applying federal procedural law. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 72-73, 79-80 (1938); Hanna v. Plumer, 380

U.S. 460, 465–66 (1965). In contract disputes, courts apply the law of the state where the parties entered into the contract or where delivery was made. Mut. Life Ins. Co. of N.Y. v. Johnson, 293 U.S. 335, 339 (1934); see also Roomy v. Allstate Ins. Co., 256 N.C. 318, 322–23, 123 S.E.2d 817, 820 (1962) (holding that the law of the state where a contract is entered into governs its interpretation). Here, the Complaint alleges that the contract was signed and delivered in North Carolina. (First Am. Compl. (Doc. 21) ¶ 25.)

This court, sitting in diversity jurisdiction, "appl[ies] the operative state law as would the highest court of the state" whose law governs. Liberty Mut. Ins. Co. v. Triangle Indus., Inc., 957 F.2d 1153, 1156 (4th Cir. 1992). If the state's highest court has not addressed an issue, then a "state's intermediate appellate court decisions constitute the next best indicia of what state law is although such decisions may be disregarded if the federal court is convinced by other persuasive data that the highest court of the state would decide otherwise." Id. (quoting 19 Charles A. Wright, Arthur R. Miller & Edward H. Cooper Federal Practice and Procedure § 4507, at 94–95 (1st ed. 1982)) (internal quotation marks omitted).

## III. **MOTION TO DISMISS**

### A. **Declaratory Judgment**

Plaintiffs ask this court to enter a declaratory judgment stating, among other things, that "the 'Transaction Fee of 5% of the Transaction Value' means five percent of the sales price." (First Am. Compl. (Doc. 21) ¶ 68.) Under North Carolina law, this court cannot enter the requested declaratory judgment.

The documentation provided by Plaintiffs and attached to the Complaint expressly states that the listing agreement "is made subject to Benchmark's Standard Terms and Conditions which are incorporated herein by reference." (Doc. 21-1.) The Standard Terms and Conditions, in turn, state that the "Transaction Value" used to calculate any commission "may consist of . . . any liability of the Business which is included in the Transaction, or which is assumed, paid, assigned, guaranteed or forgiven by the Prospect at the time of, or as a result of, the Transaction." (Doc. 21-2.) In other words, it is plain from the face of an incorporated document that the commission fee is equal to a percentage of a number that may or may not be the total sales price and that the commission fee might be calculated based on the value of client obligations that are

assumed by the buyer (such as, for example, obligations pursuant to a commercial lease).[2]

The parties to a contract may incorporate other documents by reference and these incorporated documents themselves automatically become part of the contractual agreement.[3] See, e.g., Martin Cty. v. R.K. Stewart & Son, Inc., 63 N.C. App. 556, 558, 306 S.E.2d 118, 119 (1983) ("By incorporating into their contract another contract and several other contract documents, as was expressly and deliberately done, the parties bound and subjected themselves to all the provisions that those several instruments contain."). And, "[i]f the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract." Walton v. City of Raleigh, 342 N.C. 879, 881, 467 S.E.2d 410, 411 (1996). "It is well-nigh axiomatic that no verbal agreement between the parties to a written

---

[2] Despite Plaintiffs' arguments to the contrary, (see Pls.' Resp. Br. (Doc. 16) at 8), the definition of Transaction Value in the Standard Terms and Conditions is not ambiguous merely due to the use of the word "may." The definition clearly states that Transaction Value could equal a non-cash benefit obtained by Carpet, such as a lease assumption, undermining Plaintiffs' attempt to create ambiguity where there is none. See, e.g., Rhoades v. Rhoades, 44 N.C. App. 43, 44–45, 260 S.E.2d 151, 152–53 (1979).

[3] This court finds no legal support for Plaintiffs' contention, (see Pls.' Resp. Br. (Doc. 16) at 6), that incorporating documents by reference requires either a course of dealing between the parties or an explicit instruction about how to access the incorporated items. See R.K. Stewart, 63 N.C. App. at 558, 306 S.E.2d at 119.

contract, made before or at the time of the execution of such contract, is admissible to vary its terms or to contradict its provisions." <u>Jefferson Standard Life Ins. Co. v. Morehead</u>, 209 N.C. 174, 174, 183 S.E. 606, 607 (1936).

Here, the contract properly incorporated the Standard Terms and Conditions, the relevant contractual provision is clear, and Plaintiffs' allegations regarding verbal assurances about the five percent calculation cannot vary the contractual language. Plaintiffs ask this court for a declaratory judgment stating that a term clearly defined in the contract means something different. This result would run contrary to decades of well-established contract law. Therefore, Defendants' motion to dismiss Plaintiffs' declaratory judgment request will be granted.

B. **Fraud and Misrepresentation**

Plaintiffs' fraud and misrepresentation claim is based on Plaintiffs' alleged reliance upon statements by Defendants regarding the commission fee calculation and Defendants' alleged failure to correct Plaintiffs' misapprehension about the base number used for this calculation. (First Am. Compl. (Doc. 21) ¶¶ 71-75.)

The "essential elements of factual fraud are: (1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4)

which does in fact deceive, (5) resulting in damage to the injured party." Terry v. Terry, 302 N.C. 77, 83, 273 S.E.2d 674, 677 (1981) (citation omitted). The plaintiff's reliance on any false representation or material concealment "must be reasonable." State Props., LLC v. Ray, 155 N.C. App. 65, 72, 574 S.E.2d 180, 186 (2002); see also Johnson v. Owens, 263 N.C. 754, 757–58, 140 S.E.2d 311, 313–14 (1965) ("When the circumstances are such that a plaintiff seeking relief from alleged fraud must have known the truth, the doctrine of reasonable reliance will prevent him from recovering for a misrepresentation . . . ."). The related claim of negligent misrepresentation also requires that the plaintiff "justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." Raritan River Steel Co. v. Cherry, Bekaert & Holland, 322 N.C. 200, 206, 367 S.E.2d 609, 612 (1988) (emphasis added).

"A person who executes a written instrument is ordinarily charged with knowledge of its contents, and may not base an action for fraud on ignorance of the legal effect of its provisions" unless the parties to the relationship were engaged in a fiduciary relationship imposing a heightened duty to clarify or explain aspects of the agreement. Int'l Harvester Credit Corp. v. Bowman, 69 N.C. App. 217, 220, 316 S.E.2d 619, 621 (1984). For that reason,

where one executes the very instrument intended to be executed, though induced to do so by some fraud in the treaty, or some fraudulent representation or pretense, as, for example, where a person who can read the instrument neglects to do so because of some false representation, and executes it under a misapprehension as to its contents[,] such person is bound by the instrument at law.

Furst & Thomas v. Merritt, 190 N.C. 397, 397, 130 S.E. 40, 43 (1925).

Here, although Plaintiffs assert that they have "reasonably relied upon the Defendants' silence and representations," (First Am. Compl. (Doc. 21) ¶ 87), any such reliance is unreasonable as a matter of law because Plaintiffs' misunderstanding could have been corrected by a close reading of the contract and incorporated documents.[4] Plaintiffs also fail to allege that Defendants owed them a fiduciary duty or any other heightened

---

[4] Plaintiffs further contend that they were never "presented with, much less given an opportunity to review, the purported terms and conditions" prior to signing the contract, (First Am. Compl. (Doc. 21) ¶ 38), and "exercised reasonable prudence by questioning the Defendant Benchmark's vice president" about the commission fee. (Pls.' Resp. Br. (Doc. 16) at 5.) Because Plaintiffs were alerted to the presence of these additional terms and apparently failed to investigate independently, Plaintiffs' reliance on Benchmark's oral statements was not reasonable. See Davis v. Davis, 256 N.C. 468, 471-72, 124 S.E.2d 130, 133 (1962) ("So one who contracts with another cannot ignore the contract merely because he becomes dissatisfied upon learning of the obligation assumed when, without excuse, he made no effort to ascertain the terms of the contract at the time he executed it.").

duty.[5] Cf. Caper Corp. v. Wells Fargo Bank, N.A., No. 7:12-CV-357-D, 2013 WL 4504450, at *8 (E.D.N.C. Aug. 22, 2013). Therefore, Defendants' motion to dismiss Plaintiffs' fraud and misrepresentation claim will be granted.

### C.   Unfair and Deceptive Trade Practices

"In order to establish a prima facie claim for unfair trade practices, a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." Dalton v. Camp, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). "In a business context, whether a representation is deceptive may be decided by considering its effect on the average businessperson." Bolton Corp. v. T.A. Loving Co., 94 N.C. App. 392, 412, 380 S.E.2d 796, 808 (1989).

Here, Plaintiffs' unfair and deceptive practice allegations rest upon the same factual basis as their fraud claim. (See First Am. Compl. (Doc. 21) ¶ 90.) When business entities contract and one party is placed on notice that the contract may contain additional provisions set forth in an incorporated document, this party cannot show unfair and deceptive practices if reasonable investigation could have corrected any

---

[5] Plaintiffs cite to case law establishing that a heightened duty to speak exists in a fiduciary relationship, (Pls.' Resp. Br. (Doc. 16) at 4), but never explain why they believe that Benchmark was subject to any such duty.

misapprehension. See RD & J Props. v. Lauralea-Dilton Enters., LLC, 165 N.C. App. 737, 749, 600 S.E.2d 492, 501 (2004) ("The phrase 'as is' placed plaintiff, as a business, on notice that it needed to determine the 'existing condition' of the parks."). Plaintiffs, as a business entity rather than a consumer, are properly held to the objective standard of the average businessperson; that standard required Plaintiffs to proactively obtain and understand the terms and conditions that were clearly incorporated into the contract. Defendants' motion to dismiss Plaintiffs' unfair and deceptive trade practices claim will be granted.

## IV.  MOTION FOR SANCTIONS

### A.  Legal Standard & Arguments

Defendants move for sanctions against Plaintiffs' counsel for filing the initial complaint without evidentiary support, arguing claims barred by existing legal precedent, and improperly seeking to extract a settlement. (Defs.' Sanctions Mem. (Doc. 14) at 2.) Fed. R. Civ. P. 11 permits a court to sanction an attorney for "failing to make a reasonable inquiry to determine that the complaint stood well grounded in fact and warranted by existing law, [or] . . . filing the complaint for an improper purpose." In re Kunstler, 914 F.2d 505, 513 (4th Cir. 1990); see also Fed. R. Civ. P. 11(b). "[W]here there is no factual basis for a plaintiff's allegations, the complaint

-14-

violates Rule 11's factual inquiry requirement." <u>Brubaker v.</u>
<u>City of Richmond</u>, 943 F.2d 1363, 1373 (4th Cir. 1991). "A
prefiling investigation of the law will not pass muster under
Rule 11 where the complaint has absolutely no chance of success
under the existing precedent", <u>id.</u>, and is not supported "by a
nonfrivolous argument for extending, modifying, or reversing
existing law or for establishing new law." Fed. R. Civ. P.
11(b)(2). Finally, "[i]f a complaint is filed to vindicate
rights in court, and also for some other purpose, a court should
not sanction counsel for an intention that the court does not
approve, so long as the added purpose is not undertaken in bad
faith" and the added purpose does not predominate. <u>Kunstler</u>, 914
F.2d at 518.

Defendants first argue that Plaintiffs' claims lack
evidentiary support because Plaintiffs themselves have produced
both the Terms of Engagement and the Standard Terms and
Conditions, which disprove Plaintiffs' interpretation of the
commission fee structure. (Defs.' Sanctions Mem. (Doc. 14) at 5–
6.) Defendants further assert that Plaintiffs' counsel failed to
make even a minimal inquiry regarding communications in his
client's possession that might prove that Plaintiffs had
received the Standard Terms and Conditions prior to signing the
contract. (<u>Id.</u> at 8.) Second, Defendants argue that Plaintiffs'
counsel conducted insufficient pre-filing research and that

additional research would have revealed that all of Plaintiffs'
claims are barred by existing legal precedent due to the
commission fee provision in the incorporated Standard Terms and
Conditions.[6] (Id. at 11–13.) Third, Defendants contend that the
Complaint was filed for an improper purpose; namely, "to use as
leverage" in settlement negotiations. (Id. at 19.)

B. **Analysis**

1. **Lacking Evidentiary Support**

While Plaintiffs did attach the Standard Terms and
Conditions to the Complaint, proving that at some point
Plaintiffs received or became aware of this document, this court
does not understand Plaintiffs to concede that they received the
Standard Terms and Conditions prior to signing the contract.
Neil Boyles, Vice President at Benchmark, sent an email message
attaching the Standard Terms and Conditions to
"CLARKJORDAN@HOTMAIL.COM" on April 16, 2014. (See (Doc. 1-1) at
10.) While the email is addressed to "Arthur," it is not
obviously apparent from the message that it was sent to
Plaintiff Arthur Jordan or to any agent or employee of Carpet.

---

[6] Defendants make further arguments related to the Civil
RICO claim which, as noted earlier, has been withdrawn in the
First Amended Complaint. This court declines to draw any adverse
inference from Plaintiffs' decision to withdraw the Civil RICO
claim, finding that penalizing Plaintiffs for doing so would
perversely encourage parties to continue litigating questionable
claims to the bitter end to avoid conceding that such claims
should not be in court in the first place.

(See id.) The May 27, 2014 email produced by Defendants attaches only the Terms of Engagement (or listing agreement). (Id. at 14–15.) The only email produced by Defendants that conclusively demonstrates Plaintiffs received a copy of the Standard Terms and Conditions is dated May 28, 2014, (see id. at 17–19), one day after the contract was signed.

Plaintiffs' counsel states that he relied on his clients' oral statements to draft the Complaint. (Doc. 18 at 13.) Plaintiffs' counsel cannot be expected to evaluate documents or communications that he is not provided with, and, absent any evidence that Plaintiffs' counsel deliberately concealed additional emails from this court, sanctions for filing without evidentiary support are not appropriate in this case.

## 2. Barred by Existing Precedent

It is true, as this court has found, that Plaintiffs fail to plausibly allege any claim for relief pursuant to Rule 12(b)(6). However, under Rule 11, sanctions are warranted only when the "complaint had absolutely no chance of success under the existing precedent," Cleveland Demolition Co. v. Azcon Scrap Corp., 827 F.2d 984, 988 (4th Cir. 1987), and was not supported by a legitimate argument for modifying the law. While various arguments advanced by Plaintiffs are easily dispelled after a quick review of well-established legal precedent, this court finds that Plaintiffs' allegations are not so wholly devoid of

legal support as to warrant Rule 11 sanctions. Specifically, this court finds that Plaintiffs' allegations raise multiple interlocking legal questions that are not all definitively addressed by any single North Carolina case. Cf. id. at 988. Rather, Plaintiffs' claims are barred due to the interplay of incorporation by reference, parol evidence, reasonable reliance, and the "average businessman" standard for unfair and deceptive trade practice claims.

Alternatively, although this court ultimately declines to do so, certain of Plaintiffs' claims are supported by arguments for changing the law. (See, e.g., Pls.' Resp. Br. (Doc. 16) at 6 (asserting that incorporation by reference should be limited to repeat interactions or situations where access to the incorporated document is affirmatively provided).) This court does not take lightly the act of imposing Rule 11 sanctions on an attorney and therefore declines to impose sanctions on the ground that the Complaint was clearly barred by existing law.

### 3. **Improper Purpose**

Finally, Defendants argue that Plaintiffs have sued for an improper purpose because they intend to use this lawsuit as leverage in settlement negotiations. (Defs.' Sanctions Mem. (Doc. 14) at 19.) Defendants assert that "the baseless nature of their claims" should establish that Plaintiffs have sued not to vindicate any legal rights, but rather for an improper purpose.

-18-

(Id. at 18.) Defendants confuse the three prongs of the Rule 11 inquiry. While lack of evidentiary and legal support may be some evidence that a complaint was filed for an improper purpose, these facts alone cannot establish that such a purpose predominated. To the contrary, it is entirely possible to file a complaint lacking evidentiary or legal support for a proper purpose — to vindicate legal rights to which the plaintiff genuinely, but mistakenly, believes he is entitled.

Defendants further contend that the timing of this lawsuit suggests that Plaintiffs acted in bad faith by attempting to delay any suit by Defendants to recover the full commission amount, so as to force a quick settlement. (Id.) But "[i]t is hardly unusual for a would-be plaintiff to seek to resolve disputes without resorting to legal action" and this motive is not improper unless the litigation itself is frivolous. See Sussman v. Bank of Israel, 56 F.3d 450, 459 (2d Cir. 1995). This court finds that Defendants fail to show the Complaint was brought primarily for any improper purpose and declines to impose sanctions for that reason.

This court further cautions Defendants that, in the future, they should carefully analyze the three different grounds for Rule 11 sanctions and fully satisfy themselves that sanctions are in fact warranted before asking a court to take the extreme step of imposing sanctions on each and every ground. This court

finds that Defendants' request for Rule 11 sanctions is the result of what appears to be reasonable frustrations with the Complaint, but that these frustrations are not sufficient to support sanctions. Similarly, this court finds that the Complaint reflects Plaintiffs' reasonable frustrations with communications by Defendants, but that the allegations are not sufficient to support a cause of action. Neither the motion for sanctions nor the Complaint are frivolous, but both are without merit and subject to dismissal.

## V. **CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss will be granted in full and Defendants' motion for sanctions will be denied.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss Complaint or in the Alternative, Motion for Summary Judgment, (Doc. 6), is **GRANTED.**

**IT IS FURTHER ORDERED** that the claims contained in the First Amended Complaint, (Doc. 21), are **DISMISSED WITH PREJUDICE** pursuant to Fed. R. Civ. P. 12(b)(6).

**IT IS FURTHER ORDERED** that Defendants' Rule 11(c)(2) Motion for Sanctions, (Doc. 13), is **DENIED.**

As no further claims remain in this matter, a judgment for Defendants shall be entered contemporaneously with this order.

This the 18th day of March, 2019.

_____
United States District Judge